(97 N. W. Rep. 535.)

---

SIMON E. PERSONS *v.* CHARLES G. SMITH, MARY L. SMITH AND PHINEAS P. PERSONS, DEFENDANTS AND PHINEAS P. PERSONS, APPELLANT.

Opinion filed November 3, 1903.

**Evidence of Deceased Witness at Former Trial Between Same Parties, Admissible.**

1. The evidence of a witness given upon a former action between the same parties, involving the same issues, in a court of competent jurisdiction, is admissible on a subsequent trial when it is shown that the witness who gave such evidence is dead.

**Res Adjudicata—Oral Testimony as to Former Trial.**

> 2. Where it is proven by the mouth of a party on cross-examination that the litigated question was the subject of another litigation between the same parties on the same issues, in a court of competent jurisdiction of another state, where the matter in dispute was determined, and judgment entered, and the same complied with, such question will not again be investigated upon a subsequent suit, even though the former adjudication is not pleaded in bar or the judgment in the former case proven upon the trial.

**Assignment of Notes and Mortgage—Sufficiency of Description.**

> 3. A bill of sale which describes certain notes and mortgages by naming the parties thereto, and giving their place of residence and the county in which the mortgages are recorded, and which is in the possession of the grantee, is *prima facie* sufficient to identify the notes and mortgages, and to convey the title thereto, and is admissible as evidence of the grantee's ownership.

**Fraudulent Release of Mortgage.**

> 4. Under the facts appearing in the opinion, a judgment for the amount of the mortgage debt and interest was properly entered against the defendant, who had fraudulently made use of a power of attorney from the mortgagee to release the mortgage of plaintiff after it was assigned to him.

Appeal from District Court, Barnes county; *Glaspell,* J.

Action by Simon E. Persons against Charles G. Smith, Mary L. Smith and Phineas P. Persons. A judgment was entered dismissing the case as to the defendants Smith, and for a money recovery against defendant Phineas P. Persons. The defendant Persons appealed from the judgment.

Affirmed.

*Winterer & Winterer,* for appellant.

The question of *res adjudicata* can only be applied where there is an identity of parties, and an identity of issues involved. 2 Black on Judgments, Par. 534 and cases cited; same, Par. 610; *Cromwell* v. *County of Sac,* 94 U. S. 351, 24 L. Ed. 195.

But where the subject is exclusively within equity cognizance, the case is different. Its final decision at law will not preclude a re-examination in equity. 2 Black on Judgments, Par. 518; *Pollock* v. *Gilbert,* 60 Am. Dec. 732; *Bogart* v. *Hunter,* 3 Wash. C. C. 48; *Wetumpka* v. *Wetumpka Wharf Co.,* 63 Ala. 611; *Hawkins* v. *Deprist,* 4 Munf. 469; *Bigelow on Estoppel* (3d Ed.) 104; *Bos-*

*quett* v. *Crane,* 51 Col. 505; *Bush* v. *Merriman et al.,* 49 N. W. Rep. 567.

Defense of *res adjudicata,* or the estoppel of a former judgment, must be specially pleaded to be available. 9 Enc. of Pl. & Pr. 617, 614; *Davis* v. *Davis,* 26 Cal. 39; *Howard* v. *Mitchell,* 14 Mass. 242; *Bartholemew* v. *Condie,* 14 Pick. 167; *Hostler* *N.* *Hayes,* 3 Cal. 308; *Parliman* v. *Young,* 4 N. W. Rep. 139, 2 Dak. Ter. 175; *Manna et al.* v. *Ewing,* 76 N. W. Rep. 1047.

Matters creating estoppel must be specially pleaded. *Fraine et al.* v. *Burgett,* 52 N. E. Rep. 395; *Burwell Irr. Co.* v. *Alashmett,* 81 N. W. Rep. 617; *Clark* v. *Huber,* 25 Cal. 594; *Interstate Savings and Loan Ass'n* v. *Knapp et al.,* 55 Pac. 48; *Palmer Oil and Gas Co.* v. *Blodgett et al.,* 57 Pac. 947.

Where the reply contains no plea of waiver or estoppel, plaintiff is precluded from introducing proof of the same. *Whiteside* v. *Magruder,* 75 Mo. Appeals 364; *Preferred Acc. Ins. Co. of New York* v. *Parker,* 93 Fed. 158; Black on Judgments, Par. 789; *Fanning* v. *Ins. Co.,* 37 Ohio 344, 41 Am. Rep. 517; *DeVotie* v. *McGerr,* 24 Pac. 923; *Cloud* v. *Malvin,* 75 N. W. Rep. 645; *Center School Twp. et al.* v. *State et al.,* 49 N. E. 961; *Nichum* v. *Burchardt,* 47 Pac. Rep. 788; *Cockrill et al.* v. *Hutchins et al.,* 36 S. W. Rep. 375; *Mabury* v. *Farrey Co. et al.,* 60 Fed. Rep. 645; *Dean* v *Crall,* 57 N. W. Rep. 813; *Appeal of Thompson,* 17 Atl. Rep. 643.

Estoppel *in pais* cannot be proved under a general denial or as new matter. Pomeroy's Remedies and Remedial Rights, Sec. 712; *Davis* v. *Davis,* 26 Cal. 23; *Wood* v. *Ostram,* 29 Ind. 177; *Etchebone* v. *Auzerias,* 45 Cal. 121; *Clark* v. *Huber, supra.*

Under the reformed procedure as to pleading new matter, in vogue in North Dakota, *res adjudicata* must be specially pleaded following the view prevailing in other code states. *Bowe* v. *Minnesota Milk Co.,* 44 Minn. 460, 47 N. W. Rep. 151; *Glen* v. *Priest,* 48 Fed. 19.

The better opinion is that judgment cannot be given in evidence to support the defense of former recovery, or adjudication in a previous suit between the same parties, unless specially pleaded. *Porter* v. *Leache,* 22 N. W. Rep. 104.

Plaintiff cannot avail himself of the question of *res adjudicata* for the reason that there is a total want of proof. Plaintiff sought to offer the printed abstract used in *Persons* v. *Persons* in U. S. Circuit Court. Copies of records and judicial proceedings in the

courts of the United States, as of a state or territory of the United States, can only be used as evidence, when attested by the clerk of such court with its seal annexed, together with the certificate of the judge thereof, that the attestation is in due form. Rev. Codes 1899, Sec. 5691.

This proof was objected to, and is not a part of the record. A plea of *res adjudicata* cannot be supported where neither the pleadings nor judgment in the former suit are introduced in evidencre. *Walker* v. *Redding,* 23 So. 565; *Keech* v. *Beatty et al.* 59 Pac. 837; *Bullet* v. *Taylor,* 69 Am. Dec. 412; *Glaze* v. *Bogle,* 31 S. E. Rep. 169; *Cherry* v. *York,* 47 S. W. Rep. 184; *City of New York* v. *Brown,* 57 N. Y. S. 742; *Clariday* v. *Reed,* 53 S. W. Rep. 302; *Jones on Evidence,* Sec. 644.

A trust relating to personal property may be shown by parol evidence. *First National Bank* v. *Moss,* 80 Mo. App. 408; *Skeen* v. *Marriott,* 61 Pac. Rep. 296; Pom. Eq. Jur., Sec. 1008; Perry on Trusts, Sec. 98; Beech on Trusts and Trustees, Sec. 52; *Vance* v. *Park,* 7 Ohio Dec. 564; *Thompson* v. *Carruthers,* 50 S. W. Rep. 331; *Woods* v. *Matlock,* 48 N. E. Rep. 384; *Stubblefield* v. *Stubblefield,* 49 N. W. Rep. 565; *Eiber* v. *Benner,* 71 N. W. Rep. 511; *Cooper* v. *Thompson,* 45 Pac. 296; *Allen* v. *Withrow et al.,* 3 U. S. Sup. Ct. Rep. 517; *Pitney* v. *Bowdon,* 18 Atl. Rep. 211; *Williams* v. *Haskins,* 29 Atl. Rep. 371; *Bostwick et al.* v. *Mahaffy,* 12 N. W. Rep. 192.

The assignment was a gift *causa mortis* by Thomas Persons to his son Simon E. Persons. Rev. Codes 1899, Sec. 3558, 3559, 3560. As there was no delivery in the lifetime of the donor, the transfer must fail. *Luther* v. *Hunter,* 7 N. D. 544, 75 N. W. Rep. 916, 14 Am. & Eng. Ency. of Law. 1056.

Since the gift *causa mortis* failed for lack of delivery and there was no gift *inter vivos* the transfer fails. *Luther* v. *Hunter,* 7 N. D. 544, 75 N. W. Rep. 916; *Appeal of Walsh,* 15 Atl. 470; *Dunbar* v. *Dunbar,* 13 Atl. 578; *Gano* v. *Fisk,* 3 N. E. Rep. 532; *Trenholm* v. *Morgan,* 5 S. E. Rep. 721; *Yancy* v. *Field,* 8 S. E. Rep. 721; *Basket* v. *Hassell,* 107 U. S. 602-415, 27 L. Ed. 500; *Harris* v. *Clark,* 3 N. Y. 93; *Knight* v. *Tripp,* 49 Pac. 838; *Knight* v. *Tripp,* 54 Pac. 267.

If there was a gift *causa mortis,* it failed by the recovery of the donor. Rev. Codes 1899, Sec. 3560; *Van Dusen* v. *Rawley,* 8 N. Y. 358.

*Lee Combs,* for the respondent.

Exhibit K being copy of the deposition of Maria Persons in case of Persons v. Persons in U. S. Circuit Court, District of Minnesota, and L being the pleadings in same action, being judicially determined in that case to be competent testimony, are properly in evidence, and must be considered by this court, and also because their competency is clearly established in this action by the testimony of Page Persons and his witnesses. Parol testimony of a person who heard it is always admissible to show what facts were adjudicated in a judgment. *Taylor* v. *Neyes,* 79 N. W. Rep. 998.

Under an issue in *assumpsit,* any fact tending to disprove the plaintiff's right of recovery, is admissible under a general denial, including matter *res adjudicata. Young* v. *Rummell,* 2 Hill (N. Y.) 478; *Niles* v. *Totman,* 3 Par. (N. Y.) 594; *Cook* v. *Vinont,* 6 T. B. Mon. (Ky.) 284; *Gray* v. *Pingry,* 17 Vt. 419; *Cook* v. *Field,* 3 Ala. 53; *Little* v. *Barlow,* 37 Fla. 232; *Hempstead* v. *Stone,* 2 Mo. 65; *Wood* v. *Jackson,* 8 Wend. 9; *Reynolds* v. *Stansnury,* 20 Ohio 344; *Finley* v. *Handest,* 30 Pa. St. 190; *Bartels* v. *Scheel,* 16 Fed. 341; *Fitz* v. *Clark,* 7 Minn. 217; Herman on *Res Adjudicata* and Estoppel, Sec. 1274; *Whitney* v. *Clarinden,* 18 Vt. 252; *Clark* v. *Thurston,* 47 Cal. 21.

The court erred in denying plaintiff's request to amend by pleading former recovery. *William* v. *Bethany,* 1 La. 315; *La Croix* v. *Macquart,* 11 Miles (Pa.) 42; *Garvin* v. *Dawson,* 13 S. & R. (Pa.) 276.

The assignment was sufficient in law, and appellant failed to establish that it was burdened with a trust. The finding and judgment are overwhelmingly supported. *Jasper* v. *Hazen,* 4 N. D. 1, 58 N. W. Rep. 454; *Lockwood* v. *Canfield,* 20 Cal. 126; *Silvey* v. *Hodgdon,* 52 Cal. 363.

*Cochrane,* J. Plaintiff's action is to foreclose a mortgage upon real estate in Barnes county, N. D., and for general relief. His ownership of the note and mortgage is through a written assignment of them made by Thomas Persons, the payee and mortgagee named in the instruments. The mortgagors, Charles G. Smith and Mary L. Smith, answered, alleging that the note and mortgage had been fully paid and satisfied prior to the commencement of the action. Phineas P. Persons, also a defendant, answered separately, alleging that the note and mortgage in suit were fully paid and satis-

fied, and that the assignment of the note and mortgage was made by the payee and mortgagee therein to plaintiff in trust. Paragraph 4 of his answer is as follows:

"That on the said 23d day of January, 1897, and some time prior thereto, the said Thomas Persons, being the father of plaintiff and this defendant, was seriously ill in the town of Alma, in the state of Washington, with the expectation of living but a very short time, and, desiring that the expenses of his said sickness and last sickness, and, in case of his death, the expenses of his funeral, and the cost of removing his remains to the state of Minnesota, and also the necessary expenses of taking Maria Persons, the aged wife of said Thomas Persons, and the mother of this plaintiff and this defendant, from said state of Washington to the state of Minnesota, and also the expenses of the plaintiff and this defendant in traveling to and from said state of Washington to said state of Minnesota, be paid out of the property of the estate of said Thomas Persons, then and there, on said 23d day of January, A. D. 1897, in the presence of this plaintiff and this defendant, and agreeable to the same, set aside, composed, and constituted the balance of said mortgage, and the net proceeds of the same, as part of a fund or means to pay all said expenses and costs, and, in order to aid in, and more effectually carry out, the intention, purpose and understanding of said Thomas Persons with reference to the said fund, said Thomas Persons assigned his interests in the balance of the said mortgage, and the net proceeds of the same, without any consideration whatsoever, to this plaintiff, upon the express condition and understanding, however, that the said assignment should not be delivered or take effect until after the death of the said Thomas Persons, and upon the death of the said Thomas Persons, the said Simon E. Persons, this plaintiff, should have charge and control of the balance of the said mortgage, and the net proceeds of the same, as a part of the trust fund to pay the expenses and matters herein above mentioned."

By counterclaim, defendant sought to recover from the plaintiff certain expenditures alleged to have been made pursuant to the instructions of plaintiff's assignor. The counterclaim was denied by plaintiff. The case was tried to the court without a jury, pursuant to section 5630, Rev. Codes 1899, and resulted in a judgment dismissing the case as against the defendants Smith, and in a money judgment against the defendant Phineas P. Persons for the amount

of the mortgage indebtedness, with interest and costs, amounting to $1,129.95. The appeal is by Phineas P. Persons, and he demands a review of the entire case upon all of the testimony taken below.

Thomas Persons, the father of the parties to this appeal, in expectation of immediate death, made the assignment in question to his son Simon Persons, the plaintiff, on the 23d day of January, 1897, at Alma, in the state of Washington. It was in the form of a bill of sale, and described the property as a "real estate mortgage given by H. E. Keene and wife, of Barnes county, North Dakota; also one given by Charles G. Smith and wife. All of said mortgages are recorded in the county of Barnes, Town of Valley City, North Dakota." This instrument was duly signed by Thomas Persons and by Maria Persons, his wife, in the presence of subscribing witnesses, and duly acknowledged, and subsequently, on March 1, 1897, delivered by the defendant upon the express instructions of Thomas Persons. This assignment was sufficient, both in law and in fact, to transfer the ownership of the mortgage in suit, and the note secured thereby, as against the objections of defendant. The fact of the assignment is admitted by the pleadings, and its legal sufficiency has been determined beyond question, so far as these parties are concerned. *Persons* v. *Persons,* 105 Fed. 39, 44 C. C. A. 348. The real point in issue is whether or not this assignment was burdened with a trust. If not burdened with the trust claimed by the defendant, the plaintiff is entitled to a judgment free from all alleged counterclaims, for the reason that the sums attempted to be counterclaimed by defendant are for services and advances alleged to have been made by defendant for and at the request of Thomas Persons, to be reimbursed out of the fund realized from the Keene and Smith mortgages. The items counterclaimed were litigated in an action between these parties in the United States Circuit Court for Minnesota, in which action Simon Persons sued to recover from his brother Phineas the amount of the Keene mortgage, transferred by the same instrument of assignment as the mortgage here in question. In that case Phineas pleaded the same defenses, and the same items of alleged expenditures as counterclaims, that he sets forth in this action. The issues were there determined against him, and judgment awarded against him in favor of the plaintiff for the value of the Keene note. This judgment was affirmed on appeal, and the judgment was paid by defendant. These matters of counterclaim cannot again be litigated.

The plaintiff never became responsible for them, and in no view could they be recovered against the plaintiff. The burden of proof was on the defendant to show both the defense of payment and the alleged trust.

For an understanding of the case, a review of the circumstances leading up to and accompanying the assignment is necessary. Thomas Persons resided at Valley City, N. D., for six years prior to October 18, 1892. He was a man of considerable means, and loaned his money upon real estate security. His son Phineas, the appellant, also resided at Valley City, and assisted his father in the making of loans and the collection of interest; and, during the six years of his father's residence there, Phineas handled for him a business aggregating from forty to fifty thousand dollars. The loan to Charles G. Smith in November, 1892, was made, and the note and mortgage in suit taken, by Phineas Persons, for, and in the name of his father, Thomas Persons. From October, 1892, until March 1, 1897, Thomas Persons resided at Alma, in the state of Washington, and during this time Phineas continued to transact business for his father in the making of collections and remittances upon unclosed business in North Dakota. He did this under a general power of attorney executed and delivered to him by Thomas Persons and wife on the 28th day of October, 1892. At the time of the making of the assignment herein mentioned, the note and mortgage, the subject thereof, were, and at all times had been, in the physical custody and possession of Phineas Persons. On January 23, 1897, Thomas Persons, then 83 years of age, was sick, and believed himself about to die. His sons Simon and Phineas were summoned to his bedside. Phineas arrived first, and was consulted by his father as to the disposition of his estate. He was advised by Phineas to transfer his property directly to the beneficiaries, and thus save the cost of probating the same in the four states in which it was situated. Phineas, in these preliminary talks, doubtless mentioned the Keene and Smith notes, and suggested that he be permitted to use them. It is upon this conversation, on the morning of January 23d, that he bases his claim that these notes were made a special trust for his benefit. In answer to questions by his counsel, Phineas testified: "Q. What was said, if anything, by your father, relative to the Keene and Smith notes, and when? A. He said during the conversation that occurred before he went for Mr. Wakefield— He said he didn't want to make the papers to myself; he

wanted to pay me out of the property that was left, as I have always said there is no trouble about that. I said, 'I will cash the Keene and Smith notes as fast as I need the money.' He said he set them aside to pay all my debts. He owed some little bills, and he set them aside to pay all these bills, and give what money there is to mother. Q. Did he say anything at that time as to what kind of expenses were to be paid? A. Explained all his indebtedness that he had incurred—as doctor's bills, nurses, drug-store bills, and all his expenses; all his debts. Q. What did he say at the time relative to paying two hundred dollars to each of the boys? A. He said to give Edgar $200—He had already given Simon $200, that I had sent him in the fall—and to take $200 myself, to pay us for leaving our business at this time, and the trouble he had put us to. Q. He made a present of $200 to each of you boys? A. Yes, sir. Q. You were to pay that out of what? A. The Keene and Smith notes, and pay all of his indebtedness. Q. This conversation occurred in the presence of whom? A. In the presence of Simon, and in the presence of my mother, and a portion of it in the presence of my brother Edgar. He was not there all of the time. He went out to milk the cows, or something. Q. This item of the Keene and Smith note and mortgage he wanted to be used up for expenses, and to make this $600 out of? A. Yes, sir. Settle his accounts, all he owed me, and all the debts he had. . Q. At that time, what was said in regard to a settlement between you and your father, if anything, for settling the business between you? A. Nothing whatever; nothing about settling the business between us." A notary was sent for, who received his instructions from the mouth of Phineas, but in the presence of Thomas Persons, Maria Persons, Edgar Persons, and other persons hereinafter named. Transfers were made by Thomas Persons of his property, real and personal. Mr. Wakefield, the notary, testified: "I heard P. P. Persons ask what was to be done with the Smith and Keene notes, and he (Thomas) said, 'I want you to let Simon have them.' Then Phineas came in and said, 'You make out a bill of sale of Smith and Keene notes.'" Whereupon the foregoing assignment was drawn, and signed by both Thomas and Maria Persons. During the time the papers were being prepared, no word of explanation is testified to, showing any intention on the part of Thomas Persons to have these notes used for the payment of debts or expenses. Phineas Persons the party directly interested, makes no such claim. The witnesses

Price, Gaskell, Harding, and Wakefield, who were invited in to witness the papers, and who were present while the papers were being drawn and executed, heard nothing of such a purpose. After the papers were signed, and the notary had affixed his certificate of acknowledgment to them, they were left in the hands of Phineas Persons, to be retained until his father's death. Thereafter, and on the 1st day of March, and on the eve of the father's removal. to Afton, Minn., Thomas Persons instructed Phineas, in the presence of his family, to deliver the bill of sale to Simon, and the delivery was accordingly made. At this time Thomas had rallied from his sickness, and it was his intention to, and he did, by this delivery, put the ownership of the note and mortgage in Simon. Between January 23d and the time when the old people arrived in Afton, Minn., in April, Phineas and Simon remained with their parents. On November 14, 1896, Phineas Persons, in his own interest, but assuming to act under the general power of attorney given him in 1892, negotiated with the Smiths to take from them a warranty deed of the land covered by their mortgage, and to release the mortgage. There was due at that time upon the mortgage debt $775 and one year's interest, which amount Phineas testified he agreed with the Smiths to pay to his father. A deed was made out by the attorneys for the defendant, dated November 14, 1896, in which Phineas Persons was named as grantee. This deed was not finally executed and acknowledged by the Smiths until the 17th day of June, 1897, and the deed was recorded on January 17, 1898. After this deed was delivered to him, Phineas surrendered to the Smiths their note, and also executed a satisfaction of the mortgage; signing his father's name thereto, and acknowledging it as attorney in fact for his father. This satisfaction was acknowledged on November 14, 1897, about one month before Thomas' death, and was not recorded until May 11, 1901, a date subsequent to the commencement of this action. The Keene mortgage described in the foregoing assignment was also released by Phineas, signing his father's name by himself as attorney in fact, just prior to his father's death. The evidence clearly shows that these releases were made without the knowledge or consent of either Thomas Persons or of Simon Persons, and with the intent to cheat and defraud the plaintiff. Phineas testified that he did not pay the amount of the Smith mortgage to his father at the time of the release, and there is no competent evidence that he paid it at any time, before or since.

Giving the testimony of Phineas Persons the interpretation most favorable to his present contention, and treating the preliminary talks between himself and his father, as testified to by him, as matters of substance, and not as merged in or superseded by the subsequent execution and delivery of the assignment to Simon, nevertheless there was no authority shown in Phineas to convert these securities into cash, or to disburse their proceeds. Neither the answer nor the testimony of defendant states a defense in this particular. All rights of Phineas Persons to deal with these securities was ended by the delivery of the assignment to Simon without qualification or condition. The general power of attorney held by Phineas was thereby revoked, so far as these securities were concerned. If Thomas Persons had a right to revoke the gift, he never exercised it. That Thomas intended this delivery as a final and absolute one is amply proven by the evidence, and the same evidence discloses the bad faith of Phineas, who also knew the property to be in Simon. It is in proof that, subsequent to this assignment, Simon asked his brother about the Smith note in their father's presence. Phineas answered that he had talked to Smith, and he was going to take a deed of 160 acres to satisfy this mortgage, and then sell the land back to Smith on the crop-payment plan, " 'but, ' he said, 'the trade is off now. I guess Smith will be disappointed.' Father said: 'It was Simon and Smith now. I have nothing to do with it.' " Simon then agreed that he would take a deed of the land from the Smiths, and sell the land back to them on a crop-payment contract, and Phineas said, "I will have that done when I get back." After Thomas Persons had been removed to Simon's home, in Afton, Phineas returned to Valley City. On April 22, 1897, he wrote his father in the following language: "Dear Father and Mother: I send you check for $180.00, the Keene interest, to hand to Simon." And again, under date of May 31, 1897, he wrote his father; the concluding sentence of this letter being: "Tell Simon I saw Smith and as soon as he is done seeding will have the matter fixed with him." These letters were given to Simon by his father, and the check for the Keene interest was also given to him. This evidence conclusively establishes the fact that Thomas Persons and Phineas fully understood the property in these notes to be in Simon. Edgar and Nettie Persons and S. M. Prince corroborated the testimony of Phineas Persons as to the conversation had on the morning of January 23d, before the notary was called and the writings drawn,

to the effect that Thomas expressed a desire to have his debts paid out of the Smith and Keene notes. Simon Persons and Maria deny that Thomas made use of any expression upon the subject, and positively and directly deny that the gift to Simon was burdened with any trust. That Phineas did state to his father a desire to convert and use the Smith and Keene notes for his own purposes can readily be believed, and it is quite likely that the witnesses to the conversation might, after the lapse of time before their testimony was taken in this case, have become confused in their recollection as to what was said by Phineas Persons, and what by the father. But whatever was said on this subject before the notary was called in, and the matters reduced to writing, it is clear that Thomas Persons did not intend to have these securities used by Phineas at the time the assignment was drawn, or at the time it was delivered. All preliminary talks were disregarded, and the suggestions made to him rejected, when he executed the assignment. No witness testifies that in the presence of the notary he expressed any purpose to have these notes used to pay debts or expenses. Phineas, interested in securing the notes to himself, did not tell the notary of any understanding, other than that expressed in the writing. Not a single expression was there used by any one counter to the direction of Thomas that Simon was to have the notes. Had Phineas understood that he was empowered to use these securities for any purposes whatever, some mention of it would have been made to his brother when the assignment was delivered, or between its delivery and the time of his father's death. Some explanation would have been made of the debts he was expected to pay. Simon would have been consulted before the mortgages were released. The secret method of releasing them is strong evidence of the bad faith of Phineas' present claim. Thomas Persons owed no debts at the time this assignment was made, and it is not fair to presume that he would set aside $2,800 of securities to pay the expenses of his funeral, and the removal of his family to Minnesota.

It will be observed that, under the averments of his answer, the only expenses which Thomas Persons desired to have paid from these notes were the expenses of his then and last sickness, and, in case of his death, the expenses of his funeral, the costs of removing his remains to the state of Minnesota, and also the necessary expenses of taking Maria Persons from Washington to Minnesota, and the expenses of plaintiff and defendant to Washington and

return. The pleading expressly limits the purpose of the trust claimed by defendant to these purposes. The testimony, therefore, of Phineas, hereinbefore quoted, to the effect that Thomas was indebted to him, and that the notes were set aside to pay all his debts, and also the testimony of defendant that his father owed him $750 for services at this time, which was to be paid from these notes, can only be considered as bearing upon his credibility, as such evidence is incompetent under his pleading, and does not tend to substantiate any issue tendered thereby. The evidence does not show that Thomas was indebted for the purposes mentioned when he caused the assignment to be delivered to Simon, in March, unless it was for the $200 given to Simon, and the like amount given to Phineas, to pay the expense of their visit, and which defendant testifies he advanced, to be paid from the proceeds of these mortgages. We think the evidence not only fails to support the allegations of the answer, but is irreconcilably opposed to it. As before stated, the proofs of this trust must rest largely upon the weight to be given defendant's testimony, and the facts and circumstances as they then existed. The admitted conduct of the defendant was so duplicitous, overreaching, and dishonest, that, even if he were not positively contradicted in his assertions by credible witnesses and facts and circumstances in the case, the issues tendered by him could not be considered as proven. Notwithstanding the statements of his verified answer as to the purpose of the alleged trust, when inquired of as a witness as to what was said by his father relative to the Keene and Smith notes, he evaded a direct reply to the question, and attempted to show that his father was indebted to him, and assented to the use of these notes to pay a debt to him. His answer was, in part: "He said he did not want to make the papers to myself; he wanted to pay me out of the property that was left, as I have always said there is no trouble about that. I (Phineas) said, 'I will cash these Keene and Smith notes as fast as I need the money.' He said he set them aside to pay all my debts." If this was even in part the language of his father, defendant knew it when he drew his answer, but it contains no averments to sustain this evidence. By the statement that he would cash the Keene and Smith notes, the impression would be conveyed that they were at that time intact. Further on in his evidence, defendant testified that they were wholly unpaid at this time. Yet, by his verified answer, he had before sworn that, on the authority of his father, he

had collected and received on November 14, 1896, the sum of $775 in payment of the Smith mortgage, and had applied the same according to his father's instructions. By these sworn statements of his answer, which he subsequently attempted to verify upon the trial, but which the documentary proofs refute, and which he was forced to retract, he attempted to impute to his father the intentional deception of giving to Simon a mortgage which he knew to be paid and satisfied. Thomas was not indebted to Phineas at this time, and he did not believe himself to be so indebted. On the contrary, Phineas was indebted to his father in an amount exceeding $5,000. His father had repeatedly endeavored to get an account of these moneys from him, and to get him to pay up, but without avail. At this time, in January, when Thomas was finally arranging his affairs, he mentioned the fact of Phineas' indebtedness to him, showing that he had it in mind; and Phineas expressly recognized the obligation to his father in the presence of his mother and brother, and did not attempt to repudiate it until after his father's death. Phineas testified that he had no settlement with his father since 1892, and that there was no accounting between them at this time in Alma. Up to the time his father moved from Valley City, N. D., to Alma, Wash., defendant handled from $40,000 to $50,000 of his father's money. Before his father left Valley City, defendant claims to have had a full accounting with him. Maria Persons denies that any such account was had. On the 28th day of October, 1892, the day before his father left Valley City, the power of attorney before mentioned was executed and delivered by his father and mother to defendant, to enable defendant to close up their business in Minnesota and North Dakota. At the same time his father deeded to him seven quarter sections of land in Barnes county. The consideration named in the deeds was $10,500. The Middlesex Banking Company had held a mortgage upon defendant's farm for $3,500, which Thomas purchased, and had assigned to himself. There was due on this mortgage at this time $4,000. Seventeen days after the power of attorney was executed, and Thomas had removed from Valley City, defendant filed for record in the office of the register of deeds a satisfaction of this mortgage, which was signed with his father's name by Phineas Persons, as attorney in fact. Without considering the remarkable circumstances under which this release was made, we find here $14,500 which defendant should have accounted for to his father. He testified that between

October, 1892, and January 23, 1897, he remitted to his father about $7,500. No explanation is given as to the balance. Defendant also testified that during his father's residence in Washington his mother conducted with him all correspondence. His father did not write. Maria Persons, under these circumstances, was familiar with her husband's business transactions with the defendant. When this case was tried, Maria Persons was dead. Her testimony was taken in a case between these parties in the United States Circuit Court for Minnesota, growing out of the conversion of the Keene note transferred to Simon by the same assignment as the Smith note now in suit. The issues in that case were the same as in this. It was competent to prove her testimony in that case upon this trial. 11 Am. & Eng. Enc. of Law, 523, and cases cited: *Atchison, etc., Ry. Co.* v. *Osborn* (Kan.) 67 Pac. 547; *Fredericks* v. *Judah* (Cal.) 11 Pac. 133; *The Indianapolis, etc., Ry. Co.* v. *Stout,* 53 Ind. 143, 157; *Orr* v. *Hadley,* 36 N. H. 575; *Reynolds* v. *United States,* 98 U. S. 145, 25 L. Ed. 244. What she testified was proven by the mouth of Phineas Persons himself on his cross-examination, and without objection. Maria testified that Phineas never paid his father this mortgage on his farm. The following questions and answers appear in his cross-examination: "Q. Do you recollect of her testifying anything about this mortgage you say you satisfied with that power of attorney on the 17th day of November, 1892—recollect about what she testified in regard to that? A. I don't know as I could repeat the words. She testified there was a mortgage there, and father paid it. Q. Testified you had never paid it back to her or your father? A. I think she testified to that. Q. Do you recollect of her stating, also, there, that your father had frequently called for statements of account from you, and you never gave them? A. I think she testified to some such thing; yes sir. Q. What other disposition of his property did he make there? A. Phineas asked him, after he got through with his disposition, what he was going to do with the money. My husband answered, "He gave that to mother," meaning me.' Recollect her stating that? A. I think she did. Q. 'What did Phineas say to that? A. Phineas answered he did not have money with him, but he had it in the bank in Dakota; that he would pay it whenever I wanted it, or give me five per cent. As long as he had it, it would enable him to keep me as long as I live.' Recollect her testifying to that? A. I think she did. Q. 'Phineas said he would give banking interest, the

same as the bank gave.' Did she say that? A. I think she did."
Defendant admits that his mother further testified that, in a con-
versation between herself and him, when he was at Afton, at a time
when her husband was sick, "Phineas asked me how much money
I wanted, and I told him I wanted a hundred dollars to pay the
doctors; that I wanted to pay that, and didn't want my husband to
be indebted. He said he had that much with him, and took it out
of his pocket and handed it to me. He said the rest
of my interest money was in the bank. When he came
again he was going to bring what he owed father, and
what he owed me." "He attended the funeral. He left
the next morning. He returned on February 22, 1898, and I had
a talk with him about money matters. He denied, like the scoundrel
he was—said he didn't owe me a cent. He never paid me a cent
but the hundred dollars I spoke of." "Q. You say your husband
paid a mortgage on Phineas' home farm. Do you know how much it
was? A. No; suppose the records would tell. I simply know the
fact that he did. Q. Do you know whether Phineas ever paid it
back to Thomas? A. I know he never did. As quick as father
died, Phineas undertook to take everything from him. No difficulty
before he died." Simon Persons testified, as to the occurrences at
the time in question, that, after the transfers were drawn by Wake-
field, and signed and witnessed, Phineas went to his father and
asked him if that was all. "He said he thought it was. Phineas
said: 'What am I going to do with the money that I owe you?'
He said: 'Give it to mother. I want mother to have that.' He
turned around to his mother and says: 'That is all right, but I have
not got that amount of money with me. When I get back I will
pay you, and I will give you five per cent interest, or will pay you
all or part at any time.' Mother said that was all right." It also
appears in proof that Phineas stated to plaintiff at this time that he
had plenty of his father's money in his hands to pay all expenses.
This shows satisfactorily that Phineas Persons was largely in-
debted to his father, and that his claim that his father owed him
is untrue. It also explains why Thomas relied upon him to pay
the expenses of his last sickness, and the gifts of $200 to each of
his sons. At the very time this arrangement was made, Thomas
Persons turned over to his wife $1,650 in gold, and a certificate of
deposit on a bank in Hudson, Wis., for $10,500. The bank had
recently failed. He also gave to Phineas a large amount of secured

notes against parties in Washington, of the face value of more than $2,000, upon real estate in the states of Washington and Oregon, consisting of several houses, a mill, and other property, in which property, if defendant is to be believed, he had never taken sufficient interest to enable him to testify as to its kind, location, amount, or value. With such means at hand, and in the face of the then conditions and his subsequent acts, it cannot be believed that Thomas Persons intended or said that Phineas should have any control of the Keene and Smith notes, or that he set them aside for any purpose other than that expressed in the written assignment.

The evidence clearly establishes that the mortgage this action was brought to foreclose was released without the knowledge or consent of either Thomas Persons or the plaintiff. Defendant had been at Afton and in daily contact with his brother and father from the time the assignment was made, without mentioning to them any of his prior or subsequent acts concerning these securities, but took advantage of their confidence, and of the fact that the note and mortgage were in his possession, that the assignment to Simon was unrecorded, and that the power of attorney given him in 1892 was of record, and unrevoked in writing. He secured a settlement with the mortgagors, took a deed of the land to himself, and surrendered the note and mortgage in suit to the makers, and then resold the land. His actions show a systematic endeavor to secure to himself the entire of his father's estate, much of it by dishonest means. The Keene note and mortgage, transferred to his brother in the same instrument as the one in suit, was released and its proceeds appropriated by him in the same way. The $10,500 certificate of deposit of his mother was likewise compromised by him under the ostensible authority of his power of attorney, without her knowledge or consent, and the proceeds appropriated to his own use, and his aged mother left to die a dependent upon the generosity of the plaintiff.

The judgment of the trial court is amply and fully sustained by the evidence. Defendant is indebted to plaintiff for the full amount of the mortgage debt, with interests and costs. The judgment appealed from is in all things affirmed. All concur.